919 So.2d 307 (2005)
L.L.M.
v.
S.F. and C.F. and intervenor C.G.
2040280.
Court of Civil Appeals of Alabama.
July 8, 2005.
*308 William T. Fortune, Jr., of Fortune Law Firm, L.L.C., Birmingham, for appellant.
Terrinell Lyons of The Lyons Firm, Inc., Florence, for appellees S.F. and C.F.
Steve R. Graham, Florence, for appellee C.G.
THOMPSON, Judge.
L.L.M. ("the mother") appeals from a November 15, 2004, judgment entered by the Juvenile Court of Colbert County ("the juvenile court"). The mother initially appealed the judgment of the juvenile court *309 to the Colbert Circuit Court, which transferred the case to this court pursuant to Rule 28, Ala. R. Juv. P.
The mother and C.G. ("the father") are the parents of a minor child. When the child was six to eight months old, he was placed in the custody of S.F. and C.F. ("the paternal grandparents") by an order of the juvenile court. The record on appeal indicates that the parties have been before the juvenile court on several occasions regarding custody of the child. The child remained in the custody of the paternal grandparents until April 7, 2004, when the juvenile court granted the mother's petition for custody of the child and removed the child from the custody of the paternal grandparents.
On September 9, 2004, the paternal grandparents filed an emergency petition in the juvenile court seeking temporary custody of the child and seeking an award of primary physical custody of the child. At the time the paternal grandparents filed their petition, the child was four years old. In their petition, the paternal grandparents alleged that the child was in an environment that placed him in danger. The paternal grandparents referred the juvenile court to an incident at the mother's home on September 6, 2004, during which two men participated in a knife fight in the presence of the child. The paternal grandparents attached to their petition the affidavit of R.G., who was present at the mother's home on September 6, 2004; R.G. recounted the events of that day in his affidavit. The juvenile court awarded pendente lite custody of the child to the paternal grandparents.
On September 14, 2004, the father moved to intervene and petitioned to modify custody of the child, averring that there had been a material change in circumstances since April 2004 when the juvenile court awarded the mother custody of the child and that the child's safety and welfare were at risk. The father further alleged in his motion to intervene that it would be in the best interest of the child to be placed in his custody. The juvenile court granted the father's motion to intervene, and the mother answered both petitions. On November 15, 2004, following an ore tenus proceeding, the juvenile court entered a judgment, implicitly finding the child to be dependent and transferring primary physical custody of the child from the mother to the father. On November 19, 2004, the mother filed a postjudgment motion, and on December 1, 2004, the juvenile court denied that motion. The mother timely appealed.
Initially, we must address whether the juvenile court had jurisdiction to entertain this case. Neither side has raised the issue of jurisdiction before this court, "[h]owever, jurisdictional issues are of such significance that a court may take notice of them ex mero motu. Eubanks v. McCollum, 828 So.2d 935, 937 (Ala.Civ. App.2002)." Heaston v. Nabors, 889 So.2d 588, 590 (Ala.Civ.App.2004). The paternal grandparents and the father both alleged in their respective petitions facts indicating that the child was a dependent child, as defined under § 12-15-1(10), Ala.Code 1975. Specifically, the paternal grandparents and the father alleged that the child's safety and welfare were at risk. The facts alleged in the petitions indicate that the child falls within the definition of a dependent child found in § 12-15-1(10)f., which provides that a dependent child is one "[w]ho is in a condition or surroundings or is under improper or insufficient guardianship or control as to endanger the morals, health, or general welfare of the child." The alleged facts were sufficient to invoke *310 the jurisdiction of the juvenile court.[1] Therefore, we conclude that the juvenile court properly exercised jurisdiction in this case.
We now turn to the mother's first contention on appeal that the juvenile court erred by transferring custody of the child to the father because, she argues, the father failed to meet the stringent child-custody-modification standard set forth in Ex parte McLendon, 455 So.2d 863 (Ala. 1984). In its November 15, 2004, judgment granting the father's custody-modification petition, the juvenile court stated:
"[T]he Court finds that, since being placed back in the home of his mother, this child has lived in and been exposed to regular domestic family discord occasionally escalating to violence. The child has been exposed to drunkenness, lewd behavior, and foul language. On September 6, 2004, the situation became so out-of-control that the police were called to intervene and two (2) arrests were made. [The mother] is clearly not providing a safe and proper environment for a child. [The mother] has violated in every possible way the trust placed in her when this Court returned [the child] to her custody. She has misled the Court about her commitment to home and family and about the positive changes she is said to have made in her life. The significant positive changes noted by the Court in the April order now appear to have been all subterfuge. [C.M.], who [the mother] is still married to, was gone from the home by the end of May and has been replaced by another man. [The mother] has misled this Court about her commitment to the safety and well-being of this child. She has also allowed excessive drinking, boisterous conduct, and reckless behavior to continue unabated around [the child]. Both of the individuals who were arrested on September 6 at [the mother's] home were then, are now, and have continuously been living there. One of the individuals is [the mother's] new boyfriend and the other is her brother. Other persons of similar behavior are in and out of the house constantly. Since the incident on September 6 [the mother] has not changed one single circumstance in her home life in an effort to prevent that kind of incident from reoccurring. In fact, she has allowed herself to become financially dependent on the perpetrators of the incident and, in fact, testified that she intended no changes unless there was a recurrence of violence. For all that appears, [the mother] has returned to her former pattern of immaturity and allowing issues with her extended family to impact negatively on the life of [the child].
"Based upon the subterfuge built upon intentionally misleading information this Court took a risk with this child in returning custody of the child to his mother, which this Court will not take again. It clearly is not in the best interest of this child to be returned to the custody of his mother.
"... Given the above findings ... the Court finds that it would materially promote the child's best interest to place the child in the custody of his father and that another change of custody, although regrettable, would benefit this child so as to far outweigh any disruptive effects that may occur as a result of any change of custody."
Although the trial court did not make a specific finding that the child was dependent, *311 it found that the mother had placed the child in an environment that "endanger[ed] the morals, health, or general welfare of the child." § 12-15-1(10)f., Ala. Code 1975. Given the factual findings contained in the November 15, 2004, judgment, we conclude that a finding of dependency was implicit in the trial court's judgment. See O.L.D. v. J.C., 769 So.2d 299 (Ala.Civ.App.1999)(where the trial court failed to make a finding of dependency, this court, in the interest of judicial economy, determined that the evidence supported such a finding); see also A.J.J. v. J.L., 752 So.2d 499 (Ala.Civ.App.1999)(declining to remand for the trial court to make a finding of dependency when the evidence supported a finding of dependency pursuant to § 12-15-1(10), Ala.Code 1975).
Because this is a dependency case, the juvenile court needed to determine only if transferring legal custody of the child to the father was in the best interest of the child. See O.L.D. v. J.C., supra. The juvenile court's determination of dependency obviated any necessity to apply the heightened custody-modification standard found in Ex parte McLendon. However, any error in the juvenile court's application of the McLendon standard in this case is harmless error because the father necessarily met the "best interests" standard. See I.M. v. J.P.F., 668 So.2d 843, 845 (Ala.Civ.App.1995)("We note that the trial court applied the McLendon standard here rather than the `best interest' standard, but because the McLendon standard is more stringent, the trial court's error in that regard is harmless."). Therefore, we will address the mother's issue in terms of whether the evidence supports the juvenile court's determination that placing the child in the legal custody of the father was in the best interest of the child.
This court is limited in its review of a trial court's judgment when the trial court receives ore tenus evidence. A trial court's judgment based on ore tenus evidence is entitled to a presumption of correctness on appeal and will not be reversed absent a showing that the trial court abused its discretion or that the judgment is so unsupported by the evidence as to be plainly and palpably wrong. Scholl v. Parsons, 655 So.2d 1060 (Ala.Civ. App.1995). This "presumption of correctness is based in part on the trial court's unique ability to observe the parties and the witnesses and to evaluate their credibility and demeanor." Littleton v. Littleton, 741 So.2d 1083, 1085 (Ala.Civ.App. 1999). However, where the question presented on appeal is whether the trial court correctly applied the law, the ore tenus rule has no application. Ex parte Perkins, 646 So.2d 46 (Ala.1994). Where the issue presented is a question of law, this court's review is de novo and no presumption of correctness attaches to the trial court's judgment. Reynolds Metals Co. v. Hill, 825 So.2d 100 (Ala.2002).
The evidence presented at trial revealed the following pertinent facts. On September 6, 2004, shortly before the paternal grandparents filed their emergency petition for temporary custody and while the child was in the mother's custody, police officers were dispatched to the mother's home in response to a 911 emergency telephone call. J.L., the mother's boyfriend, and N.L., the mother's brother, had gotten into an argument that escalated into a knife fight. After the police officers arrived at the mother's home, J.L. and N.L. were arrested and charged with public intoxication and disorderly conduct. The September 6, 2004, incident was recorded on a videotape; the videotape was submitted into evidence at trial. At the time of the incident, the mother was hosting a birthday party for her nephew. The record *312 indicates that six children, including the child, were present when the fight broke out between J.L. and N.L.
R.G., the father's brother, testified that he arrived at the birthday party with his son on September 6, 2004, shortly before the fight erupted between J.L. and N.L. According to R.G., the adults at the party appeared to be intoxicated; he observed several empty liquor bottles around the home. R.G. testified that J.L. and N.L. began arguing inside the mother's home and used foul language in the presence of the children. R.G. testified that he then grabbed his son and the child and took them out the back door of the mother's home. According to R.G., the children heard threats of physical violence made by J.L. and N.L. during the fight; the threats included the use of a knife and a gun. R.G. testified that the children at the party also witnessed the police draw their firearms on J.L. and N.L. R.G. testified that some of the children were crying during these events.
R.G. testified that he visited the child almost every weekend while the child was in the mother's custody so that his son could play with the child. According to R.G., the mother had men in her home most of the time. R.G. testified that he did not believe that the mother's home was a proper environment in which to raise a child.
At the time of trial, the mother had separated from her second husband, C.M., and shared her home with J.L.; the mother had not yet filed for a divorce. The mother has one child, a daughter, born from a previous relationship; the mother has primary physical custody of her daughter. She also cares for two of her nephews who were entrusted to her care by the Department of Human Resources.[2] In addition to the three children and J.L., the mother also shares her home with N.L. The mother testified that she does not work outside the home but stays at home to care for the children. The mother testified that she is pursuing her GED and plans to obtain her college degree. According to the mother, J.L. and N.L. share in the responsibility of financially supporting the household while she stays at home with the children. The mother testified that the fight between J.L. and N.L. on September 6, 2004, started as a disagreement over the payment of household bills. The mother testified that if J.L. and N.L. fight again, she will ask both to move out of the house, and she will get a job of her own to pay the household bills. The mother denied that she kept any alcohol in her house. However, a picture admitted into evidence at trial shows the mother's mother drinking in the mother's home.
Pictures submitted as exhibits at trial show the mother, N.L., and other guests in the mother's home making obscene gestures. A child is present in one of the pictures depicting N.L. making an obscene gesture. The mother testified that she does not make obscene gestures in the presence of the children. The mother could not identify some of the people pictured in her home making obscene gestures.
The mother testified that she regularly attempted to call the child after the paternal grandparents received temporary custody. According to the mother, she left messages on an answering machine for the child at the paternal grandparents' home, but the child did not return her calls. The paternal grandparents testified that they *313 received the messages left by the mother but that the child chose not to return the mother's phone calls.
J.L. testified that he had lived with the mother since May 2004. The record indicates that J.L. and the mother have been involved in a romantic relationship since that time. J.L. testified that "hard" liquor is not kept in the mother's home and that neither he nor the mother drink in front of the children. J.L. testified that before the fight on September 6, 2004, he had had only three beers. According to J.L., he and N.L. had resolved their differences since the fight. J.L. testified that he believed that he and the mother could provide the child with a wholesome living environment.
A.B., a friend of the mother, testified that she spends at least three hours at the mother's home every day. According to A.B., the mother is wonderful with the children. A.B. described the mother as a caring and loving mother. A.B. testified that she has never witnessed any violent or aggressive behavior between adults in the home while in the presence of the children.
The father serves as a combat engineer in the United States Army; he is stationed in Fort Carson, Colorado. Before joining the Army, the father lived in Alabama. The father testified that his career plans include returning to college, obtaining his degree, and becoming a teacher. The father testified that he earns $1,260 a month. The father is married to A.G.; they have been married for almost one year. The father and A.G. have a daughter, S.G., who was two years old at the time of trial. The father testified that his wife stays at home with their daughter. The father and A.G. live in military housing; pictures of the house shared by the father and A.G. were admitted into evidence at trial. The father testified that if he received custody of the child, the child would attend a school on the military base and would have access to medical treatment.
The father testified that he regularly visited the child while the child was in the custody of the paternal grandparents. According to the father, his job at the time the child was in the custody of the paternal grandparents required him to work out of state on weekdays, but he returned on the weekends to visit the child. The father testified that the child had not been to Colorado to visit.
The father admitted that he had abused drugs in the past. The father testified that, in an effort to improve his situation, he completed two parenting classes and, in 2002, stopped using drugs. According to the father, he waited to seek custody of the child until his "life situation" had improved. The father testified that he felt that he now had a realistic chance of gaining custody of the child. The father testified that he contacted an attorney in April 2004 regarding the possibility of petitioning for custody of the child. The father testified that he has a good relationship with the child and that the child recognizes him as his father. According to the father, the child also has a good relationship with A.G. and S.G.
The guardian ad litem assigned to represent the interests of the child was also the guardian ad litem assigned to represent the child's interests in April 2004 when the juvenile court awarded the mother custody of the child. After the conclusion of the hearing, the guardian ad litem submitted a report to the juvenile court containing his custody recommendation. In his report, the guardian ad litem noted that at the time the mother received custody of the child in April 2004, the mother had "married, made great progress in her life, and seemed to be organizing a strong family unit." However, the guardian ad litem *314 went on to express concerns regarding the mother's current home environment, citing the frequent visitors to the home, the number of people living in the home, the presence of two father figures in the home, and a lack of stability. The guardian ad litem recommended that the child be placed in the custody of the father, specifically noting that, in his opinion, the benefits of the change in custody would more than offset any disruptive effect of uprooting the child from the mother's home. The juvenile court adopted the recommendation of the guardian ad litem in reaching its custody determination.
After carefully reviewing the record, we conclude that the evidence supports the juvenile court's determination that the child's interests would best be served by removing the child from the custody of the mother and placing the child in the father's custody. The evidence indicates that since the mother was awarded custody of the child in April 2004, the child had been exposed to lewd behavior, violence, drunkenness, and foul language. The mother has separated from her husband and now lives with her boyfriend and her brother, both of whom she relies on for financial support. The evidence also reveals that the mother is content to live in this environment and under these conditions. Given the evidence presented at trial, we cannot say that the juvenile court erred in placing the child in the father's custody, and we affirm as to this issue.
The mother also contends on appeal that the juvenile court erred in its award of visitation. Specifically, she argues that the juvenile court's judgment effectively awarded visitation to the noncustodial parent at the discretion of the custodial parent.
"`The determination of proper visitation... is within the sound discretion of the trial court, and that court's determination should not be reversed absent a showing of an abuse of discretion.' Ex parte Bland, 796 So.2d 340 (Ala.2000). `[C]ases in Alabama have consistently held that the primary consideration in setting visitation rights is the best interests and welfare of the child. Furthermore, each child visitation case must be decided on its own facts and circumstances.' Fanning v. Fanning, 504 So.2d 737, 739 (Ala.Civ.App.1987) (citations omitted). `When the issue of visitation is determined after oral proceedings, the trial court's determination of the issue will not be disturbed absent an abuse of discretion or a showing that it is plainly in error. Andrews v. Andrews, 520 So.2d 512 (Ala.Civ.App.1987).' Dominick v. Dominick, 622 So.2d 402, 403 (Ala.Civ.App.1993)."
K.L.U. v. M.C., 809 So.2d 837, 840-41 (Ala. Civ.App.2001).
In K.L.U. v. M.C., supra, the juvenile court awarded the father visitation with the parties' minor child but allowed the parties to arrange the visitation. The father appealed. This court reversed, holding that it was error for the juvenile court to allow the mother to determine the father's visitation schedule. K.L.U. v. M.C., supra. See also Bryant v. Bryant, 739 So.2d 53 (Ala.Civ.App.1999)(reversing the juvenile court's visitation award, which vested the mother with total discretion to determine the father's visitation rights).
As it pertained to the mother's right of visitation, the judgment of the juvenile court provided close regulation of the mother's visitation until the child reaches nine years of age. To that end, the juvenile court awarded the mother visitation as follows:
"The mother shall be allowed to visit the child at reasonable times when the father or the child is in the locality in which the mother resides. The father *315 shall give 48 hours notice prior to any occurrence of visitation and the visitation should be no longer than 48 hours in duration unless otherwise agreed upon by the parties. All visitation during this time period will be under the supervision and direction of the father, one of the [paternal] grandparents, or another suitable adult designated by the father.... After the child has reached the age of 9 years old, the visitation will be governed by the `Standard Visitation Out-of-State' in use by the 31st Judicial Circuit unless the parties can agree between themselves on another suitable arrangement."
The juvenile court's judgment places the father in control of the mother's visitation with the child by limiting visitation to those times that the father "is in the locality in which the mother resides." Given the authority of K.L.U. v. M.C., supra, and Bryant v. Bryant, supra, we conclude that the juvenile court erred in failing to set forth a specific visitation schedule. Therefore, we reverse that portion of the juvenile court's judgment that relates to the visitation schedule.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
PITTMAN and BRYAN, JJ., concur.
CRAWLEY, P.J., and MURDOCK, J., concur in the result, without writing.
NOTES
[1] The record indicates that the child has previously been before the juvenile court on matters relating to paternity, dependency, and custody. The record does not include pleadings and judgments relevant to those earlier proceedings.
[2] The children placed in the mother's care by the Department of Human Resources are the mother's sister's children.